UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF TEXAS
DALLAS DIVISION

| | | |
|---|---|---|
| SHARON HOFSTRA HAUGEN, DEBRA HOPE ARMOS, Individually and on behalf of others similarly situated, | § § § § | |
| Plaintiff, | § § | CIVIL CASE NO. |
| v. | § § § | _____ |
| THE NATIONAL EATING DISORDER ASSOCIATION, CLAIRE MYSKO, CHEVESE TURNER, and John Does 1 – 10, | § § § § § | **CLASS ACTION COMPLAINT FOR DECLARATORY RELIEF AND DAMAGES** |
| | § § | <u>DEMAND FOR JURY TRIAL</u> |
| Defendants. | § § | |

Comes now, Sharon Hofstra Haugen, Individually and On Behalf of Others Similarly Situated ("Haugen or Plaintiff"), and Debra Hope Armos, Individually and On Behalf of Others Similarly Situated ("Armos of Plaintiff") who file this Complaint against The National Eating Disorder Association ("NEDA), Claire Mysko ("Mysko"), Chevese Turner ("Turner") and John Does 1 – 10 ("Doe Defendant") as follows:

## <u>SUMMARY OF THE ACTION</u>

**1.** Plaintiffs bring this class action proceeding on behalf of themselves and on behalf of all persons and entities similarly situated who made a financial donation to NEDA from September 1, 2018 to present. Plaintiffs allege that Defendants engaged in a civil conspiracy, violated the Charitable Trust Doctrine, made fraudulent misrepresentations pertaining to donations on NEDA's website, engaged in fraud through non-disclosure,

misapplied donations intended to be directed toward research and treatment of evidence-based medical and mental health treatment of eating disorders, failed to disclose all material information to its donors and violated the Racketeer Influenced Corrupt Organizations Act, 18 U.S.C. § 1961 *et seq.* ("RICO").

**2.** As such, Plaintiffs, individually and as Class Representatives, seek class certification, seek a constructive trust on all assets of Defendant NEDA, seek a declaration that Defendants, individually and collectively violated the above referenced common laws and statutes, seek a return of all donations, and payment of attorney's fees, treble damages, exemplary damages and for whatever other relief to which Plaintiffs and the Plaintiff Class are entitled.

**3.** With regard to the John Doe Defendants, after conducting necessary discovery, Plaintiffs anticipate being able to identify the specific John Doe defendants as well as the acts in which they engaged in furtherance of the civil conspiracy with Defendants to violate the above-referenced statutes, acts and common law.

## **PARTIES**

**4.** Plaintiff Haugen is a resident of the State of Arizona. Plaintiff Armos is a resident of the State of California.

**5.** NEDA is a 501(c)(3) not for profit entity organized under the laws of the State of Delaware with its principal place of business in the City of New York, State of New York. NEDA solicits donations on a national basis, including the State of Texas. NEDA is represented by counsel and will be served with this Complaint pursuant to Fed.R.Civ.P. 5(b)(2)(E).

**6.** Turner is an individual residing in the State of Maryland. Turner is represented by counsel and will be served with this Complaint pursuant to Fed.R.Civ.P. 5(b)(2)(E).

**7.**     Mysko is an individual residing the State of New York. Mysko is represented by counsel and will be served with this Complaint pursuant to Fed.R.Civ.P. 5(b)(2)(E).

**8.**     The Doe Defendants are believed to be individuals whose current residences are presently unknown. The Doe Defendants will be served with a copy of the then current live pleadings when they have been identified.

**9.**     Members of the proposed Plaintiff Class are those individuals who are residents of the United States who made financial donations to NEDA from September 1, 2018 to present.

## JURISDICTION

**10.**     This Court has subject matter jurisdiction under 28 U.S.C. § 1332(d) in that this proceeding is a class action lawsuit as defined under 28 U.S.C. § 1332(d)(1)(B), the amount in controversy collectively for the class members exceeds $5,000,000 and at least one member of the Class of Plaintiffs is a citizen of states different than all named Defendants.

**11.**     Venue is proper in this district pursuant to 42 U.S.C. § 1391(b) in that NEDA conducts extensive business in this district, actively seeks donations from persons residing in this district, and material parts of Plaintiffs' causes of action arose in this district.

## Background Facts

**12.**     At all material times, Plaintiffs and the members of the proposed Plaintiff class as defined below ("Plaintiff Class") made financial donations to NEDA from September 1, 2018 to present.

**13.**     NEDA represents that it started on May 4, 1987. According to NEDA's records, "In 2001, Eating Disorders Awareness & Prevention and the American Anorexia Bulimia

Association merged to form the National Eating Disorders Association. At the time, Eating Disorders Awareness & Prevention and the American Anorexia Bulimia Association were 'the largest and longest standing eating disorders prevention and advocacy organizations in the world.'"

14.     According to its website, NEDA represents that it, "… supports individuals and families affected by eating disorders, and serves as a catalyst for prevention, cures and access to quality care." NEDA further represents that, "The NEDA Network is a partnership between NEDA and other mission-aligned organizations dedicated to advancing the field of eating disorders and building a community of support and hope. Together, we provide a unified voice in the fight against eating disorders."

15.     NEDA also represents, "As the leading U.S. nonprofit supporting individuals and families affected by eating disorders, NEDA serves as a catalyst for prevention, cures, and access to quality care. The funds you raise through NEDA Walks put life-saving resources into the hands of those in need. With every dollar you raise, we are one step closer to our shared vision of a world without eating disorders."

16.     NEDA's representations on its website also include, "By donating to NEDA you are reaching those in need with prevention programming, education and support resources, and helping to move research forward so we can better understand and treat the illness."

17.     With regard to children who have died as a result of eating disorders, NEDA represents, "Starting a fundraiser for NEDA is a thoughtful way to honor someone whose life has been impacted by eating disorders. Fundraisers to remember someone who lost their battle with an eating disorder help save lives and create a world where all those affected by eating disorders can access the support and treatment they deserve." Contrary to this public posturing, NEDA, through Defendant Turner, stated parents whose child

has died as a result of eating disorders present an "unsafe element" at its public fundraising walks which NEDA seeks to avoid and silence.

**18.**     On its website, NEDA continues its pandering by asking for donations and contributions from person's estates and retirement planning. NEDA on its website, states, "You can include NEDA in your planned giving, while achieving your financial, tax and estate planning goals. Consider the following types of assets: Wills, Trusts, Annuities, Stock, Appreciated Securities, IRAs."

**19.**     In truth and in fact, Defendants Mysko and Turner changed NEDA's mission from supporting evidence-based medical and mental health treatment for eating disorders to an extreme agenda concerned only with publicizing and politicizing unrelated social issues which exist in the United States.

<u>NEDA acquires the Binge Eating Disorder Association and adopts its mission</u>

**20.**     In or about September of 2018, NEDA announced its merger with the Binge Eating Disorder Association ("BEDA"). BEDA was founded by Defendant Turner in or about 2008. In an article published on November 18, 2018, Defendant Turner and NEDA's then CEO, Defendant Mysko were quoted as saying, "Both Mysko and Turner said they spent a lot of time talking about their values, their vision, and their goals to make sure they were aligned." That same article stated, "Turner is now helping drive the overall strategy of NEDA as its policy and strategy leader ..." As such, Defendants Mysko and Turner agreed to move NEDA away from its stated mission and towards an unrelated and extreme social agenda.

**21.**     At the time of NEDA's acquisition of BEDA, NEDA knew, or should have known, that BEDA was on the brink of financial collapse. Had NEDA conducted even rudimentary due diligence, it would have discovered that the last Form 990 filed by BEDA indicated

that BEDA's expenses exceeded its revenue by $55,099 and at the end of the last year reported by BEDA, overall expenses exceeded revenue by (-$64,228.00.) Charity Navigator, the world's largest and most utilized independent non-profit evaluator entity, gave BEDA a failing score of 10 out of 100 possible criteria points. Charity Navigator listed BEDA's liability to asset ratio as 2029.36%. Charity Navigator states that it looks for a ratio of less than 50%. It indicated that no independent audit or financial review had been conducted of BEDA.

22.    Charity Navigator estimated BEDA's Program Expense ratio at 47.46%.  To this end, with regard to BEDA, Charity Navigator stated the following: "We believe that organizations, such as this one, spending less than half of their budget on program expenses (three year average) are simply not living up to their mission. Charities demonstrating such gross inefficiency automatically receive zero points for their Liabilities to Assets Ratio score, in addition to their Program Expense Ratio score."

23.    To further demonstrate BEDA's failed financial mission, BEDA did not even file a Form 990 in 2015 and 2016. In 2014, BEDA reported total assets of $46,241, total liabilities of $112,643 for net assets of (-$66,402).

24.    By every independent and objective criteria, BEDA and its mission statement was an abject failure, financially and otherwise.  And yet, NEDA placed its overall strategy regarding eating disorders in the hands of Defendant Turner, the architect of BEDA's failure. And despite a failure to notify any of its donors or third parties, Defendants Turner and Mysko together implemented a scheme to radically change NEDA's activities and areas of activism, while still soliciting and accepting donations from people who justifiably relied upon the belief that they were contributing to a greater understanding of

evidence-based medical and mental health treatment for eating disorders. The solicitation for donations transpired on frequent, reoccurring basis.

**25.** To perpetrate Defendants Mysko and Turner's scheme to change NEDA's mission, NEDA established a "Public Policy" team for the first time in its history. Defendant Turner was tasked with overseeing this Public Policy team and was named NEDA's Chief Policy and Strategy Officer. This is a staff office which previously did not exist at NEDA. Defendant Turner brought to NEDA, Joslyn P. Smith as Director of Public Policy and Community Relations. Ms. Smith was previously the Director of Policy & Government Affairs for Defendant Turner at BEDA. Defendant Turner also brought to NEDA three (3) trainers she previously utilized at BEDA, Desiree, Hillary and Dana. These three individuals were tasked with conducting internal training at NEDA on NEDA's new mission and direction.

<u>Eating Disorders are a Mental Health Disease</u>

**26.** Eating disorders are a complex mental illness with biological, genetic and societal components. Research continually grows and gains insight into the risk factors that contribute to this illness. The reasons thus far, are multifactorial and reflect a range of biological, psychological and societal factors, such as genetics, temperament, biology, trauma, and coping mechanisms. Because of the evolving nature of eating disorders, the understanding and utilization of "evidence-based" treatment is paramount, and is the best recourse for the growing understanding of the causes and manifestations of this disease.

**27.** Evidence-based practice in eating disorders incorporates three essential components: research evidence, clinical expertise, and patient values, preferences, and characteristics. Conceptualized as a 'three-legged stool' by Sackett et al. in 1996 (BMJ),

all of these components of evidence-based practice are essential for providing optimal care in the treatment of eating disorders. Reputable, ethical eating disorder professionals, doctors, clinicians and counselors embrace some aspect of the "three-legged stool" of evidence-based practice. A failure or refusal to include evidence-based practices as part of a generally accepted treatment protocol constitutes actionable negligence on behalf of relevant organizations and constitutes medical malpractice on behalf of treatment professionals.

**28.** However, Defendant Turner has publicly stated that she does not believe in and does not trust the medical and mental health industries. In a telephone call to eating disorder industry leaders in July 2020, Defendant Turner stated that she did not believe in evidence-based treatment since it had not helped her. In social media posts, Defendant Turner reiterated her, and NEDA's apparent position by stating, "Most of the country is at a higher BMI, but when you begin to talk about people above a 35 who are visually fat, the oppression increases -- plenty of data on that. People in the 50, 60 etc (superfat) range experience even more oppression. These are the folks who are publicly chastised and harmed continuously by the medical profession. Oh the stories I could tell. Public health in this country is getting it so wrong and there is a better way, but we need to be willing to actually listen to those being harmed." [emphasis added]

**29.** Defendant Turner further stated the reasons behind NEDA adopting a radical agenda, "Those of us who have done the work around our internalized biases no longer trust the medical establishment to actually help us." [emphasis added]

**30.** After NEDA absorbed BEDA, Defendant Turner quickly began to turn NEDA into a radical organization that reflected her personal values, to the exclusion of evidence-based, medical and mental health treatment for the patients in people in need of resources

related to their eating disorders. Despite the fact NEDA had the absolute, non-delegable duty to be open and transparent with Plaintiffs, the Plaintiff Class and the public at large, Defendants violated this duty, willfully, intentionally and maliciously. In short, NEDA decided to change its mission and areas of advocacy, while publicly misleading the public and its donors that NEDA remained dedicated to evidence-based approaches to combating eating disorders.

31.     Defendants NEDA and Turner exacerbated their bad faith conduct by attempting to embrace ethically questionable racial undertones in NEDA's programming. In public posts on social media, Defendant Turner stated as follows: "Before we think about marketing ourselves, we should be thinking about how we begin centering marginalized individuals with eating disorders. We must also be centering and supporting BiPOC, LGBTQ+, fat therapists and professionals. This is not [*sic.*] space for white, straight and thin folks to jump in." This programming was reiterated by former BEDA and NEDA employee, Josylyn Smith. Ms. Smith stated in material part as follows: "This afternoon, I submitted my resignation as NEDA's Director of Public Policy & Community Relations, effective immediately. By removing Chevese, you are signaling a move away from the organization's recent commitments to center the most marginalized people with eating disorders..."

32.     NEDA's transformation from an eating disorder foundation into a radical social agenda was evidenced in July 2019. NEDA posted on its official Facebook feed a post claiming that "Eating Disorders intersect with oppressions like racism, ableism, healthism, ageism, homophobia transphobia, classism and more." NEDA removed the post after a strong public outcry against that post but not before damage had been inflicted upon persons suffering from eating disorders. And yet, Defendant Turner, who

as NEDA's Chief Policy and Strategic Officer orchestrated said post, did not apologize to those persons who expressed their personal dismay and hurt from that post. Nor did NEDA as an organization apologize. Defendant Turner did, however, apologize to those persons who assisted her with the offensive post and admitted that her plan was to turn NEDA into a radical organization by stating, "We won't be deterred in our social justice work but there is a long way to go – a lot of learning to do to navigate the vitriole [*sic.*] that this team is not familiar with. I grew accustomed to it with BEDA, but it is still very unnerving for the NEDA team. …" [emphasis added]

33.    In July 2020, a small group named "Trans Folx Fighting Eating Disorders" published a letter entitled, "An Open Letter to Eating Disorder Organizations & Institutions in Response to Statements Published About Diversity Campaigns & Solidarity with Black Lives." The demands stated in said letter included: providing reparations to Black, Indigenous people and People of Color, ("BIPOC") especially queer and transgender BIPOC; hiring a transgender consultant to revise marketing material; establishing sliding fee scales for BIPOC, transgender and gender diverse clients; redistributing wealth from the for-profit ED treatment world; embracing and incorporating non-western treatment practices; providing access to Hormone Replacement Therapy.

34.    Despite the fact the letter is well intentioned, the demands stated therein are not supported by any peer reviewed material, are not supported by any scientific or research based evidence and would ultimately harm many people who suffer from eating disorders. Nonetheless, Defendant Turner communicated NEDA's position on this letter, "… I support signing. We [NEDA] are going through the process of making big changes – all of this we support and are working towards."

## NEDA embraces the Minnesota Freedom Fund

**35.** While NEDA was still soliciting donations from third parties under the guise of using evidence-based approach to eating disorders, NEDA continued to adopt a radical, platform by posting on its Facebook page, encouraging people to donate to the Minnesota Freedom Fund. The Minnesota Freedom Fund is an organization which has, as its sole purpose, posting bail for persons accused of criminal activity and persons unlawfully in the United States being held pending trial in the State of Minnesota. Recently, it came to light that the Minnesota Freedom Fund posted bail for persons accused of murder, attempted murder, rape and other felonies. The Minnesota Freedom Fund has nothing to do with eating disorders. And yet, NEDA is the only "eating disorder organization" which is publicly supporting the Minnesota Freedom Fund.

**36.** Organizations embracing a radical social platform ,to the exclusion of medical and mental health evidence-based treatment subject the Plaintiff Class, their supporters, their donors, and any person or family who rely upon that organization for sound advice, to having claims for payment of treatment denied by insurance benefit providers. When insurance benefits providers wrongly deny claims, people with eating disorders die.

## NEDA embraces the Black Lives Matter Platform

**37.** In the aftermath of the reprehensible George Floyd murder and the weeks of protests following, NEDA posted on its website "A Black Lives Matter Resource Page." The BLM Resource Page was unique to NEDA since no other eating disorder organization, nor the NAACP, NAMI or MHA chose to include a "Black Lives Matter" Resource page. Recognizing that systemic inequality in mental health care is a reality, the latter three entities do have resource pages dedicated to Black Americans and African-Americans.

However, they stayed away from the radical political platform espoused by Black Lives Matter.

**38.**    Black Lives Matter, as a humanitarian movement can inspire evolved thinking and positive, forward thinking action. Black Lives Matter, as an equality movement can similarly so inspire. Black Lives Matter, as a justice movement also can inspire forward thinking action. But, as a political movement, Black Lives Matter is more than just a catchy slogan. As a political movement, Black Lives Matter, at its core, embraces an extreme, political agenda which seeks not to reform American society, but to first destroy it and then radically transform it into their own vision of Utopia.

**39.**    In 2016, the Movement for Black Lives (M4BL) launched its comprehensive policy agenda. Black Lives Matter approved and adopted this policy agenda which such agenda stands today. The political agenda of the Black Lives Matter movement includes the following:

1. Legalization of prostitution.

2. Decriminalization of all drug related offenses.

3. Implementation of full and comprehensive reparations for those convicted of prostitution related offenses.

4. Implementation of full and comprehensive reparations for those convicted of drug related offenses.

5. Reparations paid to foreign nations. Black Lives Matter demands that the U.S. make "reparations to countries and communities devastated by American war-making, such as Somalia, Iraq, Libya and Honduras."

6. Reparations for the alleged systemic denial of access to high quality educational opportunities in the form of full and free access for all black people (including undocumented and currently and formerly incarcerated people) to lifetime education including: free access and open admissions to public community colleges and universities, technical education, . . . educational support programs, retroactive forgiveness of student loans, and support for lifetime learning programs.

7. A right to restored land, clean air, clean water and housing and an end to the exploitative privatization of natural resources—including land and water. (No private ownership of homes?)

8. An end to all jails, prisons, immigration and youth detention, and civil commitment facilities.

9. Eliminate all money bail and pretrial detention. Eliminate criminal punishment fees and fines.

10. Provide reparations to survivors of police violence and their families, and to survivors of prison, detention and deportation violence, and their families.

11. Free, equitable, and easily physically accessible health care, delivered with dignity, and free from entanglement with systems of surveillance, policing, and punishment for all Black people.

12. A guaranteed minimum livable income for all Black people, with clearly articulated corporate regulations.

13. A disruption of the Western-prescribed nuclear family structure requirement by supporting each other as extended families and "villages" that collectively care for one another, especially our children, to the degree that mothers, parents, and children are comfortable.

**40.** The Black Lives Matter movement does not mention any awareness of eating disorders and its impact on Black Americans. Nonetheless, reputable mental health organizations have embraced assisting minority communities without wallowing in the quagmire that defines the BLM political platform. NEDA, under the leadership of Defendants Mysko and Turner embraced the political movement of BLM However, Defendants Turner and Mysko also did not disclose these facts and issues to its donors.

<u>No Reputable Studies Exist Showing Political Social Justice Movements Directly Impact Eating Disorders and Insurance Providers will Not Pay Benefits for those Issues</u>

**41.** There are no evidence based nor peer reviewed studies supporting the view that issues should be included in the therapeutic arena or counseling to treat eating disorders. Similarly, no peer reviewed studies or university supported research exist indicating that

an effective counselor must first recognize and embrace their own "privilege" in order to be the most effective counselor possible.

42. It is a fundamental tenet that insurance benefit providers do not and will not pay for "experimental or investigative treatment." Courts are universal in holding that where insurance policies contain a "no payment for experimental treatment clause," insureds/patients do not have the right to receive payment for this type of treatment. The obvious reasons insurance companies use exclusions to restrict experimental procedures are to limit their financial risk, cost containment, and to ensure the practice of safe and effective medical approaches and treatment and the elimination of uncertain and untested procedures.

43. Ordinarily, a medical device or treatment or mental health treatment is considered experimental if: "Reliable evidence shows that the consensus of opinion among experts regarding the drug, device or treatment or procedure is that further studies or clinical trials are necessary to determine its maximum tolerated dose, its toxicity, its safety, its efficacy, or its efficacy as compared with the standard means of treatment or diagnosis." Reliable Evidence means "... published reports and articles in the authoritative medical and scientific literature; the written protocol or protocols used by the treating facility or the protocol(s) of another facility studying substantially the same drug, device or treatment; or the written informed consent used by the treating facility or by another facility studying substantially the same drug, device or treatment or procedure."

44. No peer reviewed studies or university-based research exist supporting the view that political social justice m should be included in the therapeutic arena or counseling to treat eating disorders. Especially when evidence-based medical and mental health treatment is excluded. If a counselor or treatment center is fool hardy enough to include

those issues on a substantial basis within its treatment regimen, there is a substantial likelihood that the insurance benefits provider will not approve payment for any future treatment. Further, no insurance benefits provider, either voluntarily or through a court order, has disclosed that "social justice issues" are included as part of their internal treatment guidelines.

45.     When NEDA continued to fully embrace political social justice movements and distance from evidence-based, medical and mental health treatment, NEDA had the absolute non-delegable duty to advise Plaintiffs, the Plaintiff Class, donors, families, and those suffering from eating disorders and its supporters of its new mission. Despite the fact that NEDA received actual notice of Defendant Turner's and Mysko's bad faith conduct, NEDA continued to solicit and accept donations and misappropriate said donations to and for their ill-founded radical, social justice crusade unrelated to the stated cause of NEDA. On October 6, 2020, on NEDA's public Facebook page, NEDA stated as follows: "The NEDA Walk is only 2 weeks away and we are 63% away from our goal! Help us reach $80,000 by the end of the day! I know we can do it! nedawalk.org/midwest." On October 5, 2020 on NEDA's public Facebook page, NEDA stated as follows: "Don't forget! Fundraise $50 by 10/17 to receive a t-shirt!"

46.     Not for profit foundations have the duty to publicly disclose that its mission has changed and it is embracing a new vision. For example, on October 5, 2020, Project HEAL, a 501(c)(3) eating disorder foundation which formerly emphasized assisting people suffering from eating disorders to obtain treatment, sent out an email blast. Project HEAL announced it changed its mission and website and included hyperlinks in the email to its new website.

47.     Project HEAL announced its mission and vision now included: "We exist to create equity in the eating disorder treatment landscape, and we know this means we must be willing to be disruptive in the process." "We're committed to anti-racism, anti-oppression, gender equity, and taking action to create justice. Our belief in healing is not limited to individuals — we believe that systemic healing is possible, and we know that oppressive frameworks must be dismantled and reimagined for true healing to be complete." "We stand against any and all beliefs, biases, or messages that compare bodies against constructed ideals, equate health with appearance, define beauty, or assign value or worth to any individuals over others. We are anti-diet and fat-positive. We are committed to body liberation in all its forms."

48.     So too, NEDA had the absolute, non-delegable duty to similarly disclose that its mission and vision had changed, especially in the dramatic way implemented by Defendants Turner and Mysko. Knowing that in all reasonable likelihood, donations would significantly diminish, Defendants Turner and Mysko intentionally failed and refused to disclose NEDA's new, ill-founded direction. Defendants Turner and Mysko chose subterfuge, deceit and non-disclosure as their tools of trade since they had actual knowledge that its new mission was not financially viable.

49.     If Defendants' scheme to center political social justice movements to the exclusion of evidence-based, medical and mental health treatment is allowed to propagate, the damage to Plaintiffs and Plaintiff Class will not just be measured financially, but will also be measured in the number of men, women, and children who die from eating disorders who cannot receive adequate treatment because insurance benefit providers deny payment for treatment on such basis.

50.	NEDA was posting on its social media pages that it was embracing the Black Lives Matter movement, the Minnesota Freedom Fund and that eating disorders were in actuality, a social justice illness. Defendant Turner was leading a misguided attempt to exclude "thin, white straight people" from advocacy and treatment. NEDA was also consistently reaffirming its commitment to political social issues. And all the while, NEDA continued to solicit donations from third parties, including the Plaintiff Class and represented, that donations would go toward life-saving programs, advocacy efforts, and research initiatives.

51.	Defendant NEDA's latest, but perhaps most reprehensible, misconduct involved utilizing bereaved parents as fundraising pawns. To this end, prior to being fired, Defendants Turner and Mysko began to collaborate with a foundation to recognize parents whose children had died as a result of eating disorders. This new initiative was designated "Heal with Grace." However, in public solicitations, NEDA stated, "We will find strength and create change together. Our goal is to raise $100,000 in honor of the lives we've lost to eating disorders. The funds raised will support prevention, education, support resources, and critical advocacy and research initiatives."

52.	NEDA is asking bereaved parents to honor their fallen children by soliciting donations from friends, family, relatives, and colleagues. And yet how will those donations be used? These donations are being placed in NEDA's general operating account to be spent as NEDA sees fit. NEDA chose to use bereaved parents and their dead children as marketing ploys to increase donations which go into its general operating fund.

## THE CLASS

**53.**     Paragraphs 1 through 52 are hereby incorporated for all purposes.  Plaintiffs bring this action on behalf of themselves and all others similarly situated as a class action pursuant to Fed.R.Civ.P. 23. This action may properly be maintained as a class action under the Federal Rules of Civil Procedure because there is a well-defined community of interest in the litigation and the proposed class is ascertainable.

**54.**     Plaintiffs seek to represent a class composed of and defined as follows:

**All persons and corporate entities who donated
money to NEDA from September 1, 2018 to date
("class period")**

**55.**     The proposed class is not limited to those persons who reside in the State of Texas, but include those persons and corporate entities who made donations to NEDA wherever they may be located.

**56.**     Plaintiffs and the Plaintiff Class all have common and general interests.  Further, the named Plaintiffs reserve the right to modify the definition of the proposed class based on information that they or their counsel learn through discovery. The named Plaintiffs will fairly represent the interests of the class members involved.  The class meets all the requirements of Federal Rules of Civil Procedure 23 as follows.

The Class Members Share Common and General Interests

**57.**     The first prerequisite for a class action is that the Class Members share a common or general interest.  The members of the Class need not share all interests, but only a common interest.

**58.**     In this case, the common interests include, but are not limited to, with regard to Defendants' liability, that Defendants Mysko and Turner conspired to and therein did, change NEDA's mission to become a radical, social justice organization to the exclusion

of evidence-based, medical and mental health treatment. Defendants Mysko and Turner accomplished this deception by misappropriating and misdirecting donations from third parties from legitimate evidence-based, medical and mental health eating disorder treatment to unrelated, social justice issues.

Numerosity

**59.**     By examining the number of persons, both identified and listed as anonymous on NEDA's web based, donation solicitation pages (crafted as "Walks") from September 2018 to present, there are clearly in excess of five hundred (500) persons and entities who have made financial donations to NEDA. Plaintiffs have reason to believe the number of donors is numerically much greater. While the precise number of proposed class members has not yet been determined, Plaintiffs believe there is a substantial number of individuals who have been similarly damaged. Numerosity of class members will be ascertained and confirmed by discovery. The number and identity of the members of the class are readily determinable from the records of Defendant NEDA. Clearly, the numerosity element has been met.

Commonality

**60.**   There are questions of law and fact common to the proposed class that predominate over any questions affecting only the individual class members. The common questions of law and fact include, without limitation:

A.     Whether Defendants committed fraud by non-disclosure against  the Class Members;

B.     Whether the Class Members are entitled to a declaration from the Court that Defendants violated the Charitable Trust Doctrine;

C.      Whether Defendants misdirected and misappropriated the Class Member's donated funds away from eating disorder issues and toward radical, social justice issues;

D.      Whether Defendants violated the Racketeer Influenced Corrupt Organizations Act, 18 U.S.C. § 1961 *et seq.*;

E.      Whether Defendants engaged in a civil conspiracy to misdirect donated funds and apply them to issues unrelated to NEDA's stated mission;

F.      A determination of how much, if any, of their donations can be included as legitimate, tax deductible donation and how much, if any, of their donations is excluded;

G.      Whether the Plaintiff Class is entitled to a return of their donations under the theory of Money Had and Received.

<u>Adequacy</u>

**61.**   Plaintiffs will fairly and adequately represent and protect the interests of the Class Members. There are no conflicts of interest between the interests of Plaintiffs and the other Class Members. Counsel representing Plaintiffs is competent and experienced in class litigation.

<u>Superiority of Class Action</u>

**62.**   A class action is superior to other available means for the fair and efficient adjudication of this controversy. The members of the Class are so numerous that it is impracticable to bring all members before the court.  Individual joinder of all proposed Class Members is not practicable, and questions of law and fact common to the proposed class predominate over any questions affecting only individual members of the proposed class. Each member of the proposed class has been damaged, which such damages were proximately caused by Defendants and the John Doe Defendants, and is entitled to recovery of said damages. The Class Members have little incentive, if any, to prosecute

their claims independently and would be unlikely to find counsel to represent them. Further, the Class Members, upon information and belief are located in all states, and bringing all claims together in this forum saves judicial resources. The only practical mechanism is for the Class Members to vindicate their rights through class treatment of their claims which is convenient, economical and consolidates all claims in a single suit, and serves to avoid a multiplicity of suits.

**63.** Defendants, and upon information and belief, in conjunction with the John Doe Defendants, have acted or refused to act, on grounds that apply generally to the class, so that declaratory relief, statutory penalties, and awarding actual, treble and punitive damages is appropriate respecting the class as a whole. Class certification will allow those persons similarly situated to litigate their claims in the manner that is most efficient and economical for the parties and the judicial system. Plaintiffs are unaware of any difficulties that are likely to be encountered in the management of this action that would preclude its maintenance as a class action.

## CLAIMS FOR RELIEF

### Count One

### Fraud By Non-Disclosure

**64.** Plaintiff incorporates paragraphs 1 – 63 herein as if set forth verbatim.

**65.** In or about September of 2018, NEDA merged with the Binge Eating Disorder Association ("BEDA"). BEDA was founded by Defendant Turner. Defendants Mysko and Turner agreed that they were going to change the mission of NEDA from emphasizing evidence-based, medical and mental health treatment of eating disorders to radical, social justice issues which purportedly impact society in general. In fact, in an article published on November 18, 2018, Defendant Turner and Defendant Mysko were quoted as saying,

"Both Mysko and Turner said they spent a lot of time talking about their values, their vision, and their goals to make sure they were aligned."

66.     Defendants Mysko and Turner knew that in order to perpetrate their scheme, they required the hundreds of thousands of dollars in donations which were flowing into NEDA on an annual basis. Defendants Mysko and Turner also had actual knowledge that Defendant Turner's prior organization BEDA had begun to pursue a radical, social justice agenda reflecting Turner's personal views and beliefs. Plaintiffs believe that at all material times Defendant Turner was actively engaged in the eating disorder that had plagued her for many decades. To this end, in 2015, Defendant Turner reflected on the bullying which had impacted her when she stated, ""That happened almost 40 years ago, but I can remember it plain as day, as if the words were permanently seared into my skin as reminders."

67.     Persons suffering from eating disorders and their families generally wish to support organizations, foundations and persons which pursue evidence-based, medical and mental health treatment which is designed to help their loved ones. Social justice issues are political in nature and speak to alleged broad based, societal issues in the United States and not reputable evidence based medical and mental health treatment for a deadly mental illness.

68.     Defendant Turner's prior organization BEDA was on the brink of financial collapse and extinction immediately prior to the merger. The last Form 990 filed by BEDA indicated that BEDA's expenses exceeded its revenue by $55,099 and at the end of the last year reported by BEDA, overall expenses exceeded revenue by (-$64,228.00.) Charity Navigator, the world's largest and most utilized independent non-profit evaluator entity, gave BEDA a failing beta score of 10 out of 100 possible criteria points. Charity Navigator

listed BEDA's liability to asset ratio as 2029.36%. Charity Navigator states that it looks for a ratio of less than 50%. It indicated that no independent audit or financial review had been conducted of BEDA. BEDA did not even file a Form 990 in 2015 and 2016. In 2014, BEDA reported total assets of $46,241, total liabilities of $112,643 for net assets of (-$66,402). The donations coming into BEDA could not support Defendant Turner's radical views, ideology and unsustainable mission.

69.     Defendants Mysko and Turner knew that should their scheme and artifice to turn NEDA into "BEDA 2.0," that is a radical, social justice organization become public knowledge, donations would significantly and dramatically decrease. Therefore, Defendants Mysko and Turner unlawfully changed NEDA's mission without notifying any of its donors, including Plaintiffs and Plaintiff Class.

70.     Defendant Mysko, as NEDA's CEO and/or Defendant Turner, as NEDA's newly appointed Policy and Strategic Officer who was in charge of NEDA's policy direction, expressly or implicitly authorized the following solicitations for donations without advising potential donors that their financial contributions, at least in part, would be directed to pursue their social justice agenda issues. This fraud by nondisclosure occurred, in the following, but not limited to, manner:

A.     On December 18, 2018, NEDA sent an email blast which stated in material part as follows: "We are looking for passionate and dedicated individuals who are interested in serving as volunteer committee members for the NEDA Walk. Committee member tasks will include community outreach, soliciting sponsors and donations, planning activities, and assisting the walk coordinator with other tasks'";

B.      On February 20, 2019, NEDA sent an email blast which stated in material part as follows: "NEDA Walks are inspirational, community-building events where passionate walkers raise money to fund eating disorders education, prevention, and support, as well as advocacy and research initiatives. The largest eating disorders awareness events in the nation, NEDA Walks are a celebration of hope and strength, filled with body-positive activities, motivational guest speakers, and a short walk to symbolize unity in the fight against eating disorders ... As the leading U.S. nonprofit supporting individuals and families affected by eating disorders, NEDA serves as a catalyst for prevention, cures, and access to quality care. The funds you raise through NEDA Walks put life-saving resources into the hands of those in need. With every dollar you raise, we are one step closer to our shared vision of a world without eating disorders."

C.      On March 18, 2019, NEDA sent an email blast which stated in material part the following: "Your community needs you, and so do we! NEDA's goal is to make eating disorder services available to people of all genders, ages, races, and backgrounds in every zip code in the United States. Help us work toward that goal ..."

D.      On April 1, 2019, NEDA sent an email blast which stated in material part the following: "When we say the fight against eating disorders can't wait, we mean it! Eating disorders have the highest mortality rate of any mental illness, but hope is real and recovery is possible. Take action now ... Walk with us to win the fight against eating disorders. Together we will celebrate, support, and honor the lives affected by eating disorders. Time is running out"

E.      On May 31, 2019, under Defendant Mysko's purported NEDA email box, NEDA sent an email blast which stated in material part: "While we have made great

strides, statistics show there are many more people still not reaching out for help and support. **Join our Heroes Circle** today by making a monthly gift and help NEDA move our efforts forward and reach more in need. By becoming a Hero Circle member, you will have access to a closed Facebook group where you can interact with others in the community, get regular updates from the NEDA staff, and learn more about what we are doing in the fight against eating disorders. No donation is too big or too small."

F.      On September 3, 2019, NEDA sent an email blast which stated in material part the following: "At NEDA, we understand how isolating an eating disorder can feel, and we also believe that no one should have to face these illnesses alone. Join us at the NEDA Walk to hear stories of hope and to surround yourself with support from people who *just get it.* Together, we'll walk stride in stride toward hope and recovery … Early registration has its perks! Get started fundraising today and not only will you be making a difference in the fight against eating disorders, but you will also be on your way to earning exclusive NEDA gear!"

G.      On December 18, 2019, Defendant Mysko sent an email blast which stated in material part, the following: "When I think about eating disorders, I think about our community banding together to fight an illness that affects so many people. Our community is the pillar of our movement to support those struggling with eating disorders, to combat stigma and isolation, and to celebrate hope, strength and recovery. … Our nationwide NEDA Walks are crucial to creating a community unified around advocacy and understanding. These two keystone programs don't exist without our volunteers and supporters on the frontlines. The reasons to get involved may vary but the mission is the same – to support those struggling with an eating disorder. You are a part of this community and for that we are forever grateful. Will you continue to stand with us,

strengthen the pillars that move our mission forward? <u>Donate today</u>.   Help continue to change the lives of so many."

H.      On Christmas Eve, December 24, 2019, NEDA sent an email blast which stated in material part: "The hustle and the bustle of the holidays are truly upon us this week, and while they are often joyous occasions, they can also be filled with stress, anxiety, sadness, and the pressure to conform to society's ideals. The holidays, even with so much activity around us, can leave us feeling very alone. ... NEDA drives a movement to change the mainstream conversation around mental health and eating disorders. We stand with our community to increase access to care, to deliver prevention programs, and to advance groundbreaking research. The NEDA community fights for this change every day. We are grateful to have you as a part of this community. Continue to stand with us and fight for these changes. <u>Donate today.</u>

I.      On January 2, 2020, NEDA sent an email blast which stated in material part: "Eating disorders are widely misunderstood illnesses, and old stereotypes and myths often prevent people from seeking the help they need. Let's work together to change that, starting right now. Sign up to today for the **Dallas, TX NEDA Walk** on **4/4/20!** ... Help fight stigma and shine a light on eating disorders as a serious public health issue. ... By participating in the NEDA Walk, you'll be raising funds that support life-saving programs, advocacy efforts, and research initiatives. When you register and raise $100 by **2/22/20**, we will recognize you with this exclusive NEDA **drawstring bag.** It's a special reminder of your work to help create a world without eating disorders."

J.      On January 14, 2020, NEDA sent an email blast which stated in material part the following: "30 million people in the U.S. will struggle with a life-threatening eating disorder at some point in their lifetime. Whether you have been personally affected

by an eating disorder or care about someone who has, you know that the fight against eating disorders can't wait. At NEDA, we're working to make recovery a reality for everyone, but we need your help. ... Join the Dallas, TX NEDA Walk on 4/4/20 to support those affected by eating disorders. By participating in the NEDA Walk, you are raising critical funds, restoring hope, and changing the conversation surrounding eating disorders. This is your chance to make a real difference"

K.      On February 18, 2020, NEDA sent an email blast which stated in material part: "30 million Americans will struggle with an eating disorder, but it only takes YOU to make an impact. You can start by registering for the Dallas, TX NEDA Walk!  Join us on 04/04/2020 as we raise our voices and raise life-saving funds to support those affected by eating disorders. ...  We've still got a lot of fight left in us, and we know you do too! Sign up the NEDA Walk today."

L.      On April 21, 2020, NEDA sent an email blast which stated in material part the following: "This past month has been challenging in many ways, especially for those struggling with eating disorders. That's why we are committed as ever to keeping our community together, moving our mission forward, and providing free support and resources. The fight against eating disorders can't be canceled. ... We are continuing to raise our voices and raise life-saving funds through our NEDA Walks, just virtually."

M.      On July 13, 2020, NEDA sent an email blast which stated in material part the following: "NEDA provides support to those with eating disorders 365 days per year — but one of those days is extra special. And that day is the NEDA Walk! On 10/17/2020, the NEDA community will rally together online to support the fight against eating disorders. ... Fighting eating disorders takes a team, and that's why we need you! So, sign up to today for the Southwest NEDA Walk on 10/17/2020! By joining the NEDA Walk,

you'll be raising critical funds, spreading hope, and changing the conversation around eating disorders." [This solicitation for funds occurred approximately four (4) weeks after NEDA encouraged people to donate to the Minnesota Freedom Fund].

N.      On July 27, 2020, NEDA sent an email blast which stated in material part the following: "At NEDA, we understand how isolating an eating disorder can feel, and we also believe that no one should have to fight these illnesses alone. And in this time of uncertainty, we need community the most. ... That's why I am hoping that you will bring your passion for fighting eating disorders to the Virtual Southwest NEDA Walk on 10/17/2020! Together we will raise awareness and life-saving funds to build a brighter future for those suffering from eating disorders."

O.      On August 3, 2020, NEDA sent an email blast which stated in material part: "I'm reaching out today because you've shown us that you're someone who the NEDA community can truly count on. We are so appreciative of your dedicated efforts to shine a light on the seriousness of eating disorders and put life-saving resources into the hands of those in need. ... That's why I am hoping that this year you will share your passion even more by becoming a Team Captain for the Virtual Southwest NEDA Walk on 10/17/2020. ... Your team's goal is to raise $250 by 9/19. Put together a team of five fundraising superstars. If each person raises just $50, you'll get there in no time? When your team hits the $250 mark, we will send you this exclusive Team Captain T-Shirt."

71.     In each of those sixteen (16) solicitations for donations, NEDA had the absolute, nondelegable duty to inform Plaintiffs, the Plaintiff Class and all third parties that its mission had changed, that it not only did not trust but did not support evidence-based medical and mental health treatment of eating disorders. And each and every time, Defendants NEDA, Turner and Mysko failed in their duty. Defendants NEDA, under the

direction of Defendants Mysko and Turner, continued to appeal to the emotions of the Plaintiff Class. As a result, Plaintiffs, and Plaintiff Class continued to make donations relying on the belief that their donations were going to support evidence-based medical and mental health treatment of eating disorders and not a radical, social justice platform tantamount to a failed 9th grade political science experiment.

**72.** Defendants' conduct, acts and omissions as set forth hereinabove constitute fraud by non-disclosure in that:

(a)   Defendants deliberately failed to disclose material facts;

(b)   Defendants had a duty to disclose material facts;

(c)   Plaintiffs and Plaintiff Class were ignorant of the facts and did not have an equal opportunity to discover them;

(d)   Defendants intended Plaintiffs and Plaintiff Class to act or refrain from acting based on the non-disclosure; and

(e)   Plaintiffs and Plaintiff Class relied on the non-disclosure which resulted in actual proximately caused by their justifiable reliance.

**73.** As a 501(c)(3) organization soliciting donations which ostensibly were being directed toward evidence-based medical and mental health treatment of eating disorders, Defendants had the legal, moral, ethical, social and fiduciary duty to Plaintiffs and Plaintiff Class to disclose all material facts pertaining to those donations, NEDA's mission and vision and to not misapply donated funds.  Defendants failed and refused to make such disclosures. As such, Defendants' acts, conduct, omissions and misrepresentations constitute fraud by non-disclosure which was the proximate and producing cause of Plaintiffs' and Plaintiff Class' damages.

**74.** Defendants' acts of fraud by non-disclosure resulted in damages to Plaintiffs for which amount Plaintiffs seek herein.  Moreover, Defendants engaged in such conduct

knowingly, willfully, maliciously and intentionally. Therefore, Plaintiffs are entitled to recover exemplary damages in an amount to be determined by the trier of fact.

## Count Two

## Uniform Declaratory Judgments Act

## Charitable Trust Doctrine

**75.** Plaintiff incorporates paragraphs 1 – 74 herein as if set forth verbatim.

**76.** Plaintiffs bring this cause of action against Defendants pursuant to the Federal Uniform Declaratory Judgments Act, 28 U.S.C. § 2201(a).

**77.** Plaintiffs and all Class Members are persons whose rights or status are affected by the Charitable Trust Doctrine as established under common law and as such, request the Court to determine their rights under the Charitable Trust Doctrine.

**78.** The Charitable Trust Doctrine requires that a gift accepted by a charitable organization must only be used for the expressly declared charitable purposes of the donee corporation at the time of the acceptance, even if that charitable organization changes its purpose, transfers those assets or dissolves. Such restriction is imposed notwithstanding the fact that the donor did not expressly place any restrictions on the gift.

**79.** The expressly declared charitable purposes of a charitable corporation are first evidenced by its articles of incorporation and other formal manifestations of its declared purposes. They may also be evidenced by oral and informal declarations of the corporation's charitable purposes.

**80.** Plaintiffs would show that Defendants violated the Charitable Trust Doctrine by soliciting charitable donations from Plaintiffs, Plaintiff Class and third parties ostensibly for

evidence-based medical and mental health treatment of eating disorders but instead, diverted financial and employment resources to social justice resources and causes.

81.     Radical, social justice causes do not materially pertain to eating disorders. They are societal and political in nature. Donations to eating disorder organizations which qualify as 501(c)(3) not for profit organization which are diverted, in whole or in part, to radical, social justice issues render those donations not tax deductible and instead become taxable to the donee corporation. As such, Plaintiffs further seek a declaration from the Court as to the percentage of donations for which Plaintiffs and Plaintiff Class can rightfully claim as tax deductible.

82.     Under the Declaratory Judgments Act, Plaintiffs seek a declaration that Defendants violated the Charitable Trust Doctrine by operating outside the course and scope of the stated purpose in NEDA's mission statement.

**COUNT THREE**

**MONEY HAD AND RECEIVED**

83.     Plaintiffs incorporate paragraphs 1 – 82 herein as if set forth verbatim.

84.     Defendant NEDA is currently in possession of monies received as a result of donations which were fraudulently obtained. Said monies should be returned to Plaintiffs and the Plaintiff Class in equity and good conscience.  Specifically, Defendants are in possession of monies which were obtained through false pretenses, fraud by non-disclosure and misrepresentations as set forth hereinabove.

85.     Since donations solicited by NEDA after September 2018 were acquired as a result of fraud by non-disclosure and misrepresentation, Defendants have no past or present right or entitlement to said funds. Accordingly, Plaintiffs and the Plaintiff Class request the Court to order a return of all such funds.

**COUNT FOUR**

**CONSTRUCTIVE TRUST**

**86.**     Plaintiffs incorporate paragraphs 1 – 85 herein as if set forth verbatim.

**87.**     As alleged hereinabove, Defendants Turner and Mysko changed NEDA's mission from supporting evidence-based medical and mental health treatment of eating disorders to becoming a radical, social justice platform and thereby knowingly, intentionally and maliciously engaged in acts of fraud by non-disclosure, violated the Charitable Trust Doctrine and violated their duties to Plaintiffs and the Plaintiff Class.  As such, Defendant NEDA, Mysko and Turner through their wrongful conduct have been unjustly enriched at the expense of Plaintiffs and the Plaintiff Class in the amount of the total donations made to NEDA from September 1, 2018 to present.

**88.**     Plaintiffs and the Plaintiff Class therefore seek the imposition of a constructive trust on all of Defendants' assets that are traceable in any way to the unlawful solicitation of donations described above.

**89.**     Plaintiffs and the Plaintiff Class also seek the imposition of a constructive trust on any assets that Defendants might have conveyed to any other person who had knowledge whatsoever of the wrongful and fraudulent solicitations for donations.

**Count Five**

**Civil Conspiracy**

**90.**     Plaintiffs incorporate paragraphs 1 – 89 as if set forth verbatim.

**91.**     Defendants Turner and Mysko knowingly conspired to utilize NEDA as the means and instrumentality to further accomplish their radical social justice agenda by diverting donations from third parties. As proven by BEDA's financial failure, Defendants Turner and Mysko had actual knowledge that a radical, social justice agenda was not financially

viable. Donations made to NEDA were intended to be used to further evidence-based, medical and mental health treatment for eating disorders.  The purpose of the conspiracy was to cover up and hide their own illegal, personal agendas while presenting on the surface, a reputable not for profit eating disorder foundation.

**92.** Defendants Turner's and Mysko's scheme or artifice to defraud Plaintiffs and the Plaintiff Class was further perpetrated by directing tasks to accomplish said scheme to former employees of BEDA who were brought to NEDA by Defendant Turner. Defendants Turner's and Mysko's other acts in furtherance of this conspiracy include, but are not limited to, the following:

> A.   Agreeing on the substance of the scheme beginning in or about September 2018 to turn NEDA into a radical social justice organization;

> B.   Employing persons loyal to Defendant Turner who were employed at the Binge Eating Disorder Association, but whose job duties at NEDA included perpetuating and centering radical social justice agendas within NEDA;

> C.   Concealing, omitting to provide and misrepresenting financial information to Plaintiffs and the Plaintiff Class;

> D.   Concealing their scheme and pattern of wrongful activity by intentionally providing false information with regard to the extent of time utilized on work, issues and agendas which are unrelated to NEDA's mission;

> E.   Wrongfully diverting donation revenue from Plaintiffs and the Plaintiff Class from supporting evidence-based medical and mental health treatment to social justice agendas;

> F.   By representing on NEDA's website that parents of children who died as a result of eating disorders had a safe place of respect and honor when in fact, in or about August 2020, Defendant Turner advised that parents of such children presented an unsafe element at NEDA's functions.

**93.** Defendants Turner's and Mysko's acts originated, upon information and belief, in the States of New York and Maryland and involved interstate commerce. Defendants Turner and Mysko's conduct resulted in the following donations in 2020, being made to NEDA as of September 14, 2020:

Donors contributed $22,061 to the 2020 Southwest Virtual NEDA Walk;

Donors contributed $30,689 to the 2020 Southeast Virtua NEDA Walk;

Donors contributed $64,320 to the 2020 Midwest Virtual NEDA Walk;

Donors contributed $72,799 to the 2020 Northeast Virtual NEDA Walk;

Donors contributed $34,081 to the 2020 West Virtual NEDA Walk.

**94.** The above amounts represent only a very small portion of the donation transactions accepted by Defendants NEDA, Mysko and Turner, each of which diverted monies from their intended purpose.

**95.** As such, Defendants Turner and Mysko knowingly entered into an agreement whereby they failed to disclose to Plaintiffs and the Plaintiff Class material information regarding the operations of NEDA, including but not limited to, diverting Plaintiffs' and Plaintiff Class' donations and monies to and for their own use. Acts in furtherance of this conspiracy were perpetrated in the States of New York, Maryland and in whatever states the Plaintiff Class reside. Therefore, Defendants Turner and Mysko agreed to accomplish either an unlawful act or a lawful act by unlawful means and specifically intended to harm Plaintiffs and the Plaintiff class. Defendants Turner and Mysko had knowledge of the common object or purpose of the conspiracy and each of the individuals committed one or more wrongful acts in furtherance of the conspiracy.

**96.** Defendants Turner and Mysko intended to participate in the conspiracy and as a proximate result of such individuals' conduct or acts, Plaintiffs and the Plaintiff Class sustained damages in an amount exceeding the minimum jurisdictional limits of this Court for which amount Plaintiffs and Plaintiff Class herein sue. Moreover, Defendants Turner and Mysko engaged in such conduct knowingly, willfully, maliciously and intentionally. Therefore, Plaintiffs and Plaintiff Class are entitled to recover their economic damages as well as punitive damages in an amount to be determined by the trier of fact.

## Count Six

## Racketeer Influenced Corrupt Organizations Act, 18 U.S.C. § 1961 *et seq*

### BACKGROUND FACTS AND CLAIMS RELATED TO VIOLATIONS OF the FEDERAL RACKETEERING STATUTES

### A. The RICO Enterprise

**97.** Defendant Turner, Defendant Mysko, individually and through their joint conspiracy with and including, upon information and belief, certain John Doe Defendants, operated and engaged in legitimate and illegitimate activities, including the racketeering activities herein alleged which such activities caused damage to Plaintiffs and the Plaintiff Class.

**98.** Defendants Mysko and Turner, as Chief Executive Officer and Chief Policy and Strategic Officer respectively, and through the authority vested in them in those capacities, were at all relevant times operating Defendant NEDA as a single enterprise and its rights, obligations, employees, agents and assets were routinely commingled and transferred and utilized by Defendant Turner and Mysko without fair consideration to Plaintiffs and the Plaintiff Class.

**99.** At all times relevant to this Complaint, Defendants Mysko and Turner exercised dominion and control over the conduct and activities, both legitimate and illegitimate, of themselves and the operations of NEDA. Decisions concerning both the illegitimate and legitimate conduct of the enterprise operated by Defendants Mysko and Turner were made by Defendants Mysko and Turner, with the approval and/or acquiescence of Defendant NEDA and the John Doe Defendants. As such, Defendants Turner and Mysko violated 18 U.S.C. § 1962(a) by, " ... receiv[ing] any income derived, directly or indirectly, from a pattern of racketeering activity or through collection of an unlawful debt in which such person has participated as a principal within the meaning of section 2, title 18, United States Code, to use or invest, directly or indirectly, any part of such income, or the proceeds of such income, in acquisition of any interest in, or the establishment or operation of, any enterprise which is engaged in, or the activities of which affect, interstate or foreign commerce."

**100.** At all times relevant to this Complaint, Defendants Mysko and Turner violated 18 U.S.C. § 1962(c) by, " ... being associated with an enterprise engaged in or the activities of which affect interstate or foreign commerce to conduct or to participate, directly or indirectly, in the conduct of such enterprises affairs through a pattern of racketeering activity.

**101.** At all times relevant to this Complaint, Defendants Mysko and Turner violated 18 U.S.C. § 1962(d) by conspiring to violate 18 U.S.C § 1962(a) and 18 U.S.C. § 1962(c).

**102.** A RICO Act claim under 18 U.S.C. §§ 1962(a), (c) and (d) requires a plaintiff to prove the following:

> (1).    A person engaged in;

> (2).    A pattern of racketeering activity connected to;

> (3).    The conduct or control of an enterprise.

Persons

**103.** Defendants NEDA, Turner, Mysko and the John Doe Defendants qualify as "persons" under 18 U.S.C. § 1961(3). Each of Defendants NEDA, Turner, Mysko and the John Doe Defendants is an "individual or entity capable of holding a legal or beneficial interest in property" and as such, each constitutes a "person" within the meaning of 18 U.S.C. § 1961(3).

Racketeering Activity

**104.** A "racketeering activity" as defined by 18 U.S.C. § 1961(1) includes, *inter alia,* any act which is indictable under 18 U.S.C. § 1341 (relating to mail fraud); 18 U.S.C. § 1343 (relating to wire fraud); 18 U.S.C. § 1952 (relating to racketeering), and/or; 18 U.S.C. § 1952 (relating to racketeering).

Texas Penal Code §32.45 – Misapplication of Fiduciary Property

**105.** Defendants Turner, Mysko and upon information and belief, the John Doe Defendants committed the racketeering activity of misapplying fiduciary property under Texas Penal Code § 32.45 and the crime is punishable with imprisonment for more than one year. To this end, Defendants Turner and Mysko knowingly utilized NEDA as an instrument to further and accomplish their extreme, social justice agenda by diverting donations from third parties. On its website NEDA expressly represents that it, "… supports individuals and families affected by eating disorders, and serves as a catalyst for

prevention, cures and access to quality care." NEDA further represents that, "The NEDA Network is a partnership between NEDA and other mission-aligned organizations dedicated to advancing the field of eating disorders and building a community of support and hope. Together, we provide a unified voice in the fight against eating disorders." NEDA also specifically represents, "As the leading U.S. nonprofit supporting individuals and families affected by eating disorders, NEDA serves as a catalyst for prevention, cures, and access to quality care. The funds you raise through NEDA Walks put life-saving resources into the hands of those in need."

**106.** Contrary to these public representations, Defendants Mysko and Turner solicited and accepted donations acquired through fraud by non-disclosure and misapplied some of these donations for their own extreme, social justice agenda.

<u>Texas Penal Code § 32.32. False Statement to Obtain Property</u>

**107.** Defendants Turner, Mysko and upon information and belief, the John Doe Defendants committed the racketeering activity of making false statements to obtain property under Texas Penal Code § 32.32 and the crime is punishable with imprisonment for more than one year. Because of Defendant Turner's failure to maintain BEDA as a viable organization due in part to either Defendant Turner's incompetence and its embracing of extreme, social justice agendas (which such agendas mirror the views of Defendant Turner), Defendants Turner and Mysko knew that they could not openly and notoriously declare NEDA as a social justice organization. Therefore, publicly in order to continue to solicit financial donations, NEDA maintained a façade of being an eating disorder organization which embraced evidence-based, medical and mental health treatment for eating disorders.

**108.** However, Defendant Turner did not believe in, nor trust the medical community and believed the medical community "had it all wrong." Defendants Turner and Mysko knowingly utilized NEDA as an instrument to further their extreme, social justice agenda by employing BEDA's former employees, by retraining NEDA's employees in radical, social justice agendas and by urging support of other organizations, like the Minnesota Freedom Fund, which supported radical social agendas.

**109.** Contrary to false, public representations, Defendants Mysko and Turner accepted donations made by Plaintiffs and Plaintiff Class and misapplied some of these donations for their own extreme, social justice agenda.

<u>Texas Penal Code § 32.42. Deceptive Business Practices</u>

**110.** Defendants Turner, Mysko and upon information and belief, the John Doe Defendants committed the racketeering activity of engaging in deceptive trade practices under Texas Penal Code § 32.42. To this end, Defendants Turner, Mysko, and upon information and belief, the John Doe Defendants in the course of business intentionally, knowingly, recklessly, or with criminal negligence committed one or more of the following deceptive business practices: (7) represented that a commodity or service is of a particular style, grade, or model if it is of another.

**111.** In order to prevent financial donations from cratering, and having NEDA follow the *ipso facto* bankrupt status of BEDA, Defendants Turner and Mysko represented that NEDA was an eating disorder organization which continued to embrace and support evidence-based, medical and mental health treatment for eating disorders. Therefore, Defendants Turner and Mysko specifically represented that NEDA was an organization of a particular style, grade or model. In truth, and in part due to Defendant Turner not believing in nor trusting the medical community, Defendants Turner, Mysko and upon

information and belief, the John Doe Defendants were turning NEDA into a political, social justice organization. Defendants Mysko, Turner and NEDA accepted donations made by Plaintiffs and Plaintiff Class and misapplied some of these donations for their own extreme, social justice agenda.

<u>Wire Fraud – 18 U.S.C. § 1343</u>

**112.**     Defendants Turner, Mysko, NEDA and upon information and belief, the John Doe Defendants devised a scheme or artifice to defraud by means of wire, radio or television communication in interstate and foreign commerce. By reason of the conduct described hereinabove, Defendants Turner, Mysko, NEDA and the John Doe Defendants have violated, are violating, and continue to violate 18 U.S.C. § 1343 on an on-going basis by engaging in and facilitating a scheme and artifice to defraud and obtain money or property by means of false or fraudulent representations with the intent to defraud, and, in so doing, use interstate or foreign wire communications.

**113.**     Defendants Turner and Mysko engaged in conduct having a substantial impact upon interstate commerce, including by, among other methods, soliciting and accepting donations from the Plaintiff Class and third parties residing throughout the United States, selling merchandise and services in interstate commerce, entering into contracts with vendors that involve the movement of merchandise in interstate commerce, and entering into agreements affecting interstate commerce.

**114.**     Defendants Turner and Mysko obtained and used the proceeds of the racketeering activity herein alleged in and for the promotion of Defendants Mysko and Turner's conspiracy and scheme to perpetuate a radical, social justice foundation. Defendants Turner and Mysko illegally utilized donations from Plaintiffs, the Plaintiff Class and others who believed they were making tax deductible donations which were going to be

utilized to pursue the understanding and support of evidence-based, medical and mental health treatment pertaining to eating disorders.

Mail Fraud – 18 U.S.C. § 1341

**115.** Defendants Turner, Mysko, NEDA and upon information and belief, the John Doe Defendants devised a scheme or artifice to defraud by means of soliciting donations utilizing the United States Postal Service. Defendants' scheme further utilized the United States Postal Service by transferring and accepting donations and money in interstate and foreign commerce. By reason of the conduct described hereinabove, Defendants Turner, Mysko, NEDA and the John Doe Defendants have violated, are violating, and continue to violate 18 U.S.C. § 1341 on an on-going basis by engaging in and facilitating a scheme and artifice to defraud and obtain money or property by means of false or fraudulent representations with the intent to defraud, and, in so doing, use interstate or foreign communications.

Monetary Transactions Derived from Unlawful Activity – 18 U.S.C. § 1957

**116.** Defendants Turner, Mysko, NEDA and upon information and belief, the John Doe Defendants knowingly engaged in monetary transactions in criminally derived property (false statements to obtain property, deceptive business practices, fraud) of a value greater than $10,000 in the United States.

Enterprise or Association in Fact

**117.** Defendants Turner and Mysko, for themselves and as Chief Policy and Strategic Officer and Chief Executive Officer, respectively, on behalf of Defendant NEDA, participated in an enterprise or association in fact. Each Defendant participated in an on-going organization and each associate functioned as a continuing unit. The individual defendants and NEDA, the organizational entity run by Defendants Mysko and Turner

associated together to commit several criminal acts as set forth hereinabove which gave their association an ongoing nature allowing it to come within the purview of the RICO Act.

**118.** Defendants Turner, Mysko, NEDA and the John Doe Defendants, their agents and co-conspirators formed an association in fact for a common purpose of committing financial fraud perpetrated against Plaintiffs and the Plaintiff Class. All defendants associated together to commit numerous acts constituting financial fraud over several years and their acts threaten to continue.

**119.** The specific predicate acts perpetrated by Defendants Turner, Mysko and NEDA include, but are not limited to the following:

(a). They were all done by or at the direction of Defendants Turner and Mysko, with the approval and/or acquiescence of Defendant NEDA for their benefit and the personal benefit of Defendants Mysko and Turner;

(b). The illegal conduct and actions were all perpetrated by Defendants Mysko and Turner outside of the scope of the legitimate authority of their office or employment and/or for their personal benefit;

(c). The illegal conduct and actions were all directed at Plaintiffs and the Plaintiff Class in such a manner as to cause Plaintiffs, the Plaintiff Class and third parties ultimate harm or injury;

(d). The illegal conduct and actions all relate to each other as part of a common course of conduct, plan, and objective to engage in a continued and concerted course of conduct with the purpose and effect of defrauding Plaintiffs, the Plaintiff Class and third parties;

(e). The illegal actions and conduct all shared common methods in that each were committed by and under the direction of Defendants Turner and Mysko;

(f). The illegal actions and conduct all included acts of concealment, fraud by non-disclosure and/or coercion, the illegitimate economic effect of which was the diversion of financial donations and employment resources toward extreme, radical social justice causes while Defendants Turner and Mysko were officers of Defendant NEDA;

(g). The illegal actions and conduct had sufficient continuity and duration in that they occurred, from September 2018 to date current, and;

(h.) The illegal actions and conduct each pose a threat of on-going repetition against Plaintiffs and the Plaintiff Class.

**120.** These facts establish a period of repeated conduct that began as early as September 2018 and continues to date. These facts also establish that without this litigation and an award of relief, NEDA's illicit and illegal conduct will continue.

**121.** Plaintiffs and the Plaintiff Class suffered and continue to suffer injury as a direct, proximate, and foreseeable result of the foregoing criminal and illegal acts perpetrated by Defendants Mysko, Turner, NEDA and the John Doe Defendants. Accordingly, Plaintiffs and the Plaintiff Class seek class certification and subsequent thereto, an award of actual damages, costs of this litigation, and reasonable attorneys' fees.

**122.** Plaintiffs and the Plaintiff Class seek treble damages pursuant to 18 U.S.C. § 1964(c).

## <u>REQUEST FOR TRIAL BY JURY</u>

**123.** Plaintiffs and the Plaintiff Class hereby request a trial by jury.

## **PRAYER FOR RELIEF**

WHEREFORE, PREMISES CONSIDERED, Plaintiffs, individually and on behalf of others similarly situated, respectfully request that all Defendants appear and answer herein, and that upon amendment of this complaint after lawful discovery has occurred that the Doe Defendants be identified and answer and appear herein, and that the Court grant the following relief:

1.      Assume jurisdiction over Plaintiffs' claims and the claims of the Class Members;

2.      Certification of this case and the claims for class treatment, with the class defined as set forth in this complaint;

3.      Designate Plaintiffs as representatives for the class;

4.      Designate the undersigned as counsel for the class;

5.      Declare that Defendants violated the Charitable Trust Doctrine;

6.      Declare that Defendants have violated the afore-mentioned sections of the Racketeer Influenced Corrupt Organizations Act;

7.      Declare that Plaintiffs and the Class Members have sustained actual damages as a proximate result of Defendants' conduct;

8.      Return to Plaintiffs and the Plaintiff Class all monies donated to NEDA from September 1, 2018 to present under the doctrine of Money Had and Received;

9.      Award to Plaintiffs and the Class Members their actual damages as a proximate result of Defendants' conduct;

10.     Award to Plaintiffs' counsel all reasonable and necessary attorney's fees incurred prosecuting this action;

11.    Award to Plaintiffs treble damages;

12.    Award to Plaintiffs exemplary damages, and;

13.    Award such other relief, at law or in equity, as the Court deems just and

proper.

Respectfully submitted,

The Nichols Law Firm, PLLC

/s/ Justin P. Nichols
Justin P. Nichols
State Bar No. 24081371
106 S. Saint Mary's Street, Suite 255
San Antonio, Texas 78205
Telephone: 210.354.2300
*justin@thenicholslawfirm.com*

/s/Steven R. Dunn
Steven R. Dunn
State Bar No. 06252250
5830 Preston Fairways
Dallas, Texas 75252

Telephone (214) 769.7810
*steven@dunnlawfirm.net*

**ATTORNEYS FOR PLAINTIFFS**